Thank you, Your Honor. May it please the Court, my name is A. Jerry Busby. I represent the petitioners and taxpayers, Charles and Jeannie Choi. This case involves, or my clients, owned a small grocery store in Glendale, Arizona. It was a small neighborhood store and they sold meat, vegetables, canned goods. The salient part of their business as concerns this case is that they operated or provided a very substantial check cashing service to their customers. They received money as follows. They would sell groceries for food stamps, for WIC vouchers, which is a state program. They would take personal checks, I've termed them first party checks, and they would cash third party payroll checks. The evidence, as we set forth and it's been stipulated to in the various stipulations of the fact, is the WIC vouchers, the food stamps, and the first party checks are definitely for purposes of this brief, or this argument I should say, were from the sale of groceries. That's what they represented. In 1991, 9.8% or just about 10% of the total deposits to the one account represented these three items. So we're just talking about the third party checks that they cashed? We're really talking about the third party checks. Now, the testimony at trial was that most customers would come in and cash their check. They would buy a few groceries, a six pack of beer, a bread, whatever it may be, but it was a small negligible amount of the total face amount of the check. And then what happened is every, or twice a week, Mr. Choi would make a deposit to what we've termed in our briefs and referred to at the trial as the deposit account. No cash was ever deposited in there, only the third party checks and the other three items that I've discussed. Then what Mr. Choi would do, he would immediately write a check, generally for the full amount of the deposit. If he deposited $30,000, he would write a check for $30,000 and obtain that in cash. Then he would take, as it averaged out, 30% of that amount and deposit it into an operating account that he used to buy merchandise, to pay vendors, to pay utilities and other costs of doing business. The remaining 70% was taken back to the store, put in a safe, and was used to cash checks for the remainder of that period before the next deposit. Now, How do we know what Mr. Choi took out for himself? We've now accounted for 100% of the monies out of the deposit account that went back to the operating account. We don't know, Your Honor. There simply aren't records. So the problem was that the IRS conducted an audit, and then they came up with a methodology which apparently was satisfactory to the tax court judge as to the amount that your client probably took out for his own personal use, which amounted to income from whatever source derived, and determined the difference between what he reported and what was estimated. And that's the deficiency that was on which the tax was assessed, correct? Basically, that's correct, Your Honor. Okay. So you are now challenging, as I understand it, the methodology that the Commissioner employed in its presentation of the evidence to the tax court judge, saying that your methodology should have been used rather than the Commissioner's. Well, yes, because our argument is that you cannot use the bank deposits method if you cannot determine what is income and what are non-income items. And that deposit that was being made, 90% of that deposit to the large account every week, 90% of it could not be identified as from an income source. Isn't that because your client didn't keep any records? Absolutely, Your Honor. And in fact, that's why under the case law, the IRS is able to go in and use indirect methods of proof. Right. They can net worth them. They could use the specific expenditures method, the one that we suggested that should have been used and that we used as a backup to demonstrate that the tax returns is reported, did in fact report the correct amount of income, or that they can use this bank deposits method. But in order to use the bank deposits method, they must be able to identify those items of income. But nothing is going to be accurate since your client, I mean, nothing is going to be perfectly accurate because your client created the problem, essentially by not taking records. So then, what's wrong with, why is what the tax court did wrong as opposed to what you wanted them to do? I mean, your method doesn't seem to be any more accurate. Yes, Your Honor, but... It's just more favorable. I'll grant you, Your Honor, that it may appear that way. But the fact that the IRS is saying, well, tell me why it's not, why the appearances are wrong then, I guess. The courts, both the trial courts and the appellate courts have consistently insisted that to use the bank deposits method, you must be able to identify what is from an income source and what is from a non-income source. And if you can't do it... Well, that's a good question, or almost an equitable argument. But your client's hands are not clean because your client as a taxpayer did not meet its burden of keeping adequate records. And it, frankly, to be very candid, it sounds a little hollow for the taxpayer to be saying the method that the commissioner used was not fair when the reason that the commissioner had to use the equivocal method that it used was because the taxpayer didn't keep adequate records. Your Honor, as I said, no, they didn't keep adequate records. But in every tax case, except those involving a legal question, you're going to be faced with the fact that the taxpayers haven't kept good records. And that's why they're there. Well, what is the standard of review? What is the standard of review? The commissioner chose a method. The tax court judge who heard the evidence was satisfied by what was presented, that the method supported the amount that was ultimately determined by the commissioner to be due and owing. And what deference, if any, must we give to the tax court judge's reliance on the method that you say was unfair? I think you have to give a lot of deference to that, Your Honor. However, you still, I believe, are able to determine whether or not the method they relied upon did, in fact, take into account what was income and what was non-income. What do you mean by income and non-income in this context? In a bank deposit. If that bank deposit consists of a loan, that's not income. If it consists of, in this case, monies from check-cashing activities, that portion of it that represents the money given back to the customer is an income, even though it's reflected in the total deposit. The money that they start with in the, quote, as I've indicated in my brief, if they started with a $10,000 bank to cash checks and they never had any income, they just simply cashed checks and they rolled this around twice a week for a year, the bank deposits would reflect $1,040,000 in income, and yet none of it would be income. Well, but you started out your argument saying that he was running a check-cashing business, that he was charging something for cashing the checks. He charged 1 percent if they were not buying anything, or he charged $1 if the amount was less than $100 if they didn't make a purchase. If they made a purchase, there was no charge for the check-cashing activities. It was the de minimis amounts, Your Honor. Okay. You've just about used your time. If you want to, we'll give you a minute on the rebuttal because we're generous. Thank you. May it please the Court, my name is Paula Speck. I represent the Commissioner in this case. To answer Judge Schroeder's question about what the standard of review is, it is clearly erroneous review because this was a fact-finding made by the trial court after a full trial. And we submit that the trial judge, the tax court judge, was not clearly erroneous in that case. In fact, his finding is completely supported by the record. This is an unreported income case in which the taxpayer concedes, Mr. Troy concedes, not having kept adequate records. So any observations concerning whether a certain percentage of receipts can be retained are beside the point because the IRS did not go to specific items in order to reconstruct the income. Instead, yes. I don't remember. It's been a while since I studied income tax law, but I thought there was some authority that said that because the burden is on the taxpayer to keep adequate records, doesn't the case law support an imposition of 100 percent of the amount in the absence of any records? In other words, the burden really is on the taxpayer to come forward and say why all of the money that the IRS can point their finger to was not income to him. Well, that's correct. As soon as the commissioner established a linkage between income-producing activity and the taxpayer, then the burden shifts to the taxpayer, and that is correct. In this case, the burden of proof is a little complicated because the commissioner asserted fraud, on which she does have the burden. But regardless of the burden, it is clear that any burden that either party had was met in this case. The tax court had ample justification for accepting the reconstruction method that the commissioner used, which was the bank deposits method. As I understand it, Mr. Troy's chief argument against the reconstruction is that, in his view, it doesn't account for the check-cashing operation. It doesn't account, in his view, for the recycling of funds that were cashed for customers that didn't go for groceries. We do give him some credit for that, though, don't we? Indeed, we do. He simply states, but he doesn't explain why check-cashing wasn't subtracted out. What the commissioner did specifically was to take all the deposits into all the accounts, and that figure is correct. It's not disputed. Then the commissioner subtracted from that all transfers between accounts so that they wouldn't be double-counted, and that step is also not disputed. Then the commissioner subtracted all other withdrawals from the first account, the deposit account, because it is known that some of this money went into the check-cashing operation. It is also undisputed that some of it went into personal expenditures, but we're giving the taxpayer credit for that. This is why this is a conservative reconstruction. Even though we know that some of the money taken out of the deposit account was used for personal expenditures and did constitute income, we're giving him credit for all of it, because some of it went into the check-cashing. Also, the commissioner is not counting into this original pile any of the cash that was retained in the store, any of the cash that never went into the bank deposits. None of that enters into the accounting. So at the end of the day, all possible sources of cash that could have been recycled through the check-cashing account have been eliminated from the income total that the commissioner has arrived at. There are three possible sources. One is cash retained in the store that never enters into the sum. The second is cash taken out of the deposit account and returned to the store for check-cashing purposes or for any purpose, for that matter, including personal expenditure. None of that enters in. It's subtracted out. The third is any possible cash that is received from gifts from the parents or remittances from Korea. Now, there was some proof at trial, some discussion at trial about that, but the taxpayer, Mr. Choi, abandoned any assertion that there was cash from Korea or from the parents. That was simply abandoned. So it's no longer in the equation. So having accounted for all possible cash used in the check-cashing, all that remains is unreported income. And there really is no way logically on the present record for the taxpayer to get around that. How did you get the total that you excluded all these from? Sure. The total is all deposits into all accounts, plus all known and undisputed cash expenditures. That's where we get bank deposits, cash expenditures, the name of the method. Subtract all inter-account transfers to avoid duplication. Then subtract all other withdrawals from the deposit account, and you arrive at a total which is greater than the amount reported on the tax return. Now, Mr. Choi would like the tax court to have followed a percentage markup method. That method, as he applies it, would give an income of something like $3,900 in 1991 and an income of $4,300 approximately in 1992. That's actually its loss of $4,300 in 1992. That's lower than reported in the returns. That's also lower than Mr. Choi admitted in an interview with an IRS auditor. He admitted that he had underreported $15,000 a month over the two-year period. That comes to $180,000 a year that he admits underreporting. So this is in contradiction with his own statements, which he has not disavowed. How do we factor in his tax conviction by plea of guilty to tax fraud for tax year? Was it 91? It was 92. 92. Well, that stops him as to 92, as to fraud. And I don't believe they dispute that anymore. But wasn't the evidence that there was no change in the way that he operated the business? That's correct. That also makes his figures from the percentage markup method even less believable, because they are based on a practice, a business practice of keeping two different sets of records that has been disavowed in his own guilty plea, and which is linked to, that was 92, and we make the linkage to 91 because he testified that he ran the market the same way both years. So that's a further reason for the tax court not to accept the percentage markup method. And the great advantage of the bank deposits method in this case is that it depends on third-party records, the bank records. And when you have a taxpayer who conceitedly has been falsifying his own records, it's important to use a source of data to base your reconstruction on something objective that is not tainted by the double bookkeeping that taints all the other records in this case. Has this Court ever considered this method and upheld it? I believe that there's a very old case called Petzoldt. Petzoldt? That may be a tax case. We listed the ---- I understand there are a number of tax court cases. Yes. Well, Persefield. It was beginning with a P. On page 20 of our brief, we list ---- let me see. No? This is on ---- There is a Supreme Court case upholding the method, the bank deposits and cash expenditures method. And, yes, I believe the Persefield case, which is an old Ninth Circuit case, also discusses that method and validates it. The Holland case is the Supreme Court case. Holland. Most of these are fairly old cases. This is a well-established method of reconstruction of income. It, of course, is made necessary in the first place by inadequate records on the taxpayer's part. So we maintain that this is a clearly erroneous review case and that the tax court's conclusion as to the factual matters was supported by the record and is far from clearly erroneous, and no error has been shown by the taxpayer here. Thank you. Thank you. I appreciate the extra minutes, Your Honor. What we have here is there are total deposits, and we know these, if I could use the word, these deposits are tainted as to whether or not they're income or non-income. They've got the deposit account of approximately $2 million, and then there's the operating account of a little over $600,000, a total of $2.6 million that we're considering here. Of that, now, the government has rightfully taken the interbank transfer, the 625, and removed it from the equation. And then they say, what we're going to do is we're going to take the rest of it and remove it from the equation. But they should have taken the full amount that was deposited to the deposit account or, yes, to the deposit account and wiped that out, because they cannot, except for tell us how much of that was income. All right. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is Metro Leasing and Development v. Commissioner. Thank you.
judges: Schroeder, Tallman, Callahan